IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

The Estate of KATHERYN ROBINSON,　　　)
deceased, by her Special Administrator　)
REGINALD ROBINSON,　　　　　　　　　)
and The Estate of WALTER BRUCE,　　　 )
deceased, by his Special Administrator　)
LEE A. HEDRICKS,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　　)　　　No. 13 C 6353
　　　　　　　　　　　　　　　　　　　)
EDWARD J. NOVAK, ROY M. PAYAWAL,　 )
VENKATESWARA R. KUCHIPUDI a/k/a　　 )
V.R. KUCHIPUDI, PERCY CONRAD MAY, JR., )
SUBIR MAITRA, SHANIN MOSHIRI,　　　　)
VENKATA BUDDHARAJU, MERLIN KELSICK )
And VITTORIO GUERRIERO,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　 )

## PLAINTIFF'S FIRST AMENDED COMPLAINT AT LAW

NOW COME the Plaintiffs, Estate of Katheryn Robinson, deceased, by her

Special Administrator REGINALD ROBINSON, and the Estate of Walter Bruce,

deceased, by his Special Administrator LEE A. HEDRICKS, by their attorneys CURCIO

LAW OFFICES, and allege the following:

## INTRODUCTION

1.　　Plaintiff's decedent Katheryn Robinson, was a 62-year-old woman who

was admitted to Sacred Heart Hospital for treatment for dysphagia, or difficulty

swallowing. Plaintiff Robinson reported no breathing difficulties at the time she was

admitted to Sacred Heart Hospital. Robinson was subjected to a battery of tests

and procedures, including unnecessary intubation and tracheostomy, which ultimately led to complications resulting in her death.

2.      Plaintiff's decedent Walter Bruce, was a 70-year-old man admitted to Sacred Heart Hospital for medical treatment. During his time at the hospital, he was subjected to a battery of tests and procedures, including an unnecessary tracheostomy that ultimately led to complications causing his death.

3.      Defendants EDWARD J. NOVAK and ROY M. PAYAWAL, (collectively EXECUTIVES) and Defendants, VENKATESWARA R. KUCHIPUDI a/k/a V.R. KUCHIPUDI, PERCY CONRAD MAY, JR., SUBIR MAITRA and SHANIN MOSHIRI, VENKATA BUDDHARAJU, MERLIN KELSICK, and VITTORIO GUERRIERO (collectively DOCTORS), collectively and individually, conspired to knowingly and willfully offer and pay, and solicit and receive, remunerations directly and indirectly, overtly and covertly, in return for the referral of patients for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal and State health care program violating multiple federal statutes.

4.      Defendants in addition to initiating and receiving kickbacks, embarked and participated in a scheme to extend hospital stays of health care program beneficiaries to maximize payouts. These actions culminated in the knowing willful billing of the health care programs for unnecessary medical procedures to maximize payouts.

2

5.     Defendants' scheme violated multiple Federal statutes, and their state counterparts, in its course, including Federal Anti-Kickback statutes, the Stark Law, and Federal Mail Fraud statutes.

6.     Defendants' scheme was intended to defraud both Medicare and Medicaid and instituted a hospital environment that led to compromised patient advocacy and wellness resulting in hospital sanctioned, but medically unnecessary, procedures culminating in the deaths of Katherine Robinson and Walter Bruce.

## JURISDICTION AND VENUE

7.     This action is instituted and arises under the Federal law of the United States. Specifically, the Civil Racketeer Influenced and Corrupt Organizations Act (RICO). This court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964, and 18 U.S.C. §1965. The United States Supreme Court has ruled that state courts have concurrent jurisdiction over civil RICO claims. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).

8.     Venue is proper in this Court pursuant to 18 U.S.C. §1965 because the Defendants transacted a substantial amount of their business related to the overall schemes giving rise to this suit in this district. Additionally, Defendants regularly transacted business out of this district.

3

## PARTIES

9.    Plaintiffs' Decedents were both natural persons who resided in Illinois.

10.    Sacred Heart Hospital is a corporation with its principal place of business in Illinois which employed individual Defendants EDWARD NOVAK, ROY PAYAWAL as company executives. DR. PERCY CONRAD MAY JR., DR. SHANIN MOSHIRI, DR. SUBIR MAITRA, DR. VENKATESWARA KUCHIPUDI, a/k/a V.R. KUCHIPUDI, DR. VENKATA BUDDHARAJU, DR. VITTORIO GUERRIERO, and DR. MERLIN KELSICK are all physicians licensed in Illinois that were associated with, and who did business out of, Sacred Heart Hospital in Illinois.

## FACTUAL BACKGROUND

### Sacred Heart and its Employees

11.    That on and prior to March 1, 2012 the Defendant, WEST SIDE COMMUNITY HOSPITAL, INC., was incorporated and doing business as Sacred Heart Hospital. The hospital was created as a distinct and legitimate business for the purpose of medically treating patients, whether insured through public or private insurance programs.

12.    Sacred Heart Hospital is a short-term acute care hospital located in Chicago that has over 100 beds available to patients.

13.    Defendant EDWARD NOVAK is the hospital's owner and Chief Executive Officer, and has served as such since the late 1990s. Novak sought to, and succeeded in, aggressively soliciting doctors in order to maximize health care

4

payouts by violating Federal and State Regulations. Novak performed his duties as an agent of the Sacred Heart Hospital and on its behalf for economic benefit.

14.     Defendant ROY PAYAWAL served two roles with Sacred heart Hospital. He was employed at Sacred Heart as the Executive Vice President of Finance and the Chief Financial Officer.  He operated in both roles to further the schemes set in motion at Sacred Heart to defraud health care programs. Payawal performed his duties as an agent of Sacred Heart Hospital and on its behalf for economic benefit.

15.     Defendant DR. PERCY CONRAD MAY JR. has been licensed to practice medicine in Illinois since 1962 and has been enrolled as a provider in the Medicare and Medicaid program since July of 2007.

16.     Defendant DR. SHANIN MOSHIRI is a podiatric doctor licensed to practice since 1987 and has been enrolled as a provider under the Medicare and Medicaid program since November of 2012.

17.     Defendant DR. SUBIR MAITRA is a physician licensed to practice since 1975 and has been enrolled as a provider under the Medicare and Medicaid program since February of 2010.

18.     Defendant DR. VENKATESWARA KUCHIPUDI, a/k/a V.R. KUCHIPUDI, is a physician licensed to practice medicine since 1975 and has been enrolled as a provider under the Medicare and Medicaid program since September 2007.

19.     VENKATA BUDDHARAJU, VITTORIO GUERRIERO, and MERLIN KELSICK were physicians who were licensed in to practice medicine in the state of Illinois,

and who at all times herein mentioned, were enrolled as providers in the Medicare and Medicaid programs, at a date presently unknown to the plaintiff.

20.     That the Defendants, DOCTORS, were each physicians licensed to practice medicine in the State of Illinois, all of whom had been granted privileges at Sacred Heart Hospital.

**Medicare and Medicaid Regulation**

21.     The Medicare program is a federally funded heath care benefit program that provides free or below-cost health care benefits to certain eligible individuals, primarily the elderly, blind, and disabled. Medicare and Medicaid are administered by the centers for Medicare and Medicaid and Medicaid Services, known as CMS, an agency of the United States Department of Health and Human Services. Individuals who receive benefits under Medicare and Medicaid are often referred to as Medicare and Medicaid beneficiaries.

22.     The portion of the Medicare and Medicaid program known as Medicare Part A pays for certain inpatient care services provided to beneficiaries, including hospital care. The portion of the Medicare and Medicaid program known as Medicare and Medicaid Part B pays for certain physician and outpatient services provided to beneficiaries.

23.     To receive reimbursement from Medicare for services provided to its beneficiaries, hospitals and physicians must sign a provider agreement that establishes their eligibility. The standardized Medicare Part A agreement provides

that the provider agrees "[t]o abide by the Medicare and Medicaid laws, regulations and program instructions that apply to [it]."

24.    Parties who sign the Medicare agreement, including the Defendants as agents of a hospital and physicians, have knowledge of the pertinent statutes governing their actions when dealing with Medicare and Medicaid beneficiaries including the Federal Anit-kickback statute and the Stark Law.

25.    The Medicaid program is a federally assisted grant program that enables states to provide medical assistance and related goods and services to needy individuals known as Medicaid beneficiaries. The State of Illinois participates in the Medicaid program through the Illinois Department of Healthcare and Family Services, which receives approximately fifty percent of its Medicaid funds from the Federal Government.

26.    Each state establishes criteria for determining who is eligible for Medicaid coverage, what services are covered by the program, and the reimbursement rates for covered services.

## COUNT I – FEDERAL RICO

27.    Plaintiffs hereby incorporate their allegations in paragraphs 1 through 26 of this Complaint at Law to Count I as though fully set forth herein and allege as follows.

28.    Count I asserts a claim against Defendants collectively based on 18 U.S.C §1962(c), known as Civil RICO, for engaging in a "pattern of racketeering

7

activity."

29.     All Defendants were considered "persons" under the statute as defined by 18 U.S.C. §1961(3).

30.     Plaintiffs are entitled to recovery of treble damages, reasonable attorney's fees, and costs as persons injured by racketeering activity under §1962 as defined by 18 U.S.C. 1964(c).

31.     During the time at issue, Defendants set forth on a course of conduct to defraud health care systems using schemes including kickbacks and mail fraud, that established a pattern of the same, as part of a enterprise run from and as a part of Sacred Heart Hospital, that is reasonably defined as racketeering activity which resulted in the injury to Plaintiffs' decedents, entitling their estate to relief under §1962(c).

**Defendant's Fraudulent Conduct**

*General Claims*

32.     That the Defendants, EDWARD J. NOVAK and ROY M. PAYAWAL, (collectively EXECUTIVES) were the chief operating officers and chief financial officers, respectively, at Sacred Heart on and prior to March 1, 2012, and possessed and exercised decision making authority to control hospital and doctor conduct, and conform it to further Defendants' fraudulent schemes.

33.     That the Defendants, VENKATESWARA R. KUCHIPUDI, a/k/a V.R. KUCHIPUDI, PERCY CONRAD MAY, JR., SUBIR MAITRA, SHANIN MOSHIRI, VENKATA

8

BUDDHARAJU, VITTORIO GUERRIERO, AND MERLIN KELSICK (collectively DOCTORS) have knowingly and willingly conspired to offer, pay, solicit and receive remunerations directly and indirectly, overtly and covertly in return for the referral of patients for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under Federal and State health care programs.

34.    That the remunerations were intended to further a scheme to defraud Federal and State health care programs, and were at times sent through mail carriers on behalf of Defendant EXECUTIVES and Sacred Heart and were intended to be received by Defendant DOCTORS.

35.    That each of them, individually and collectively, have embarked upon a scheme, device and conspiracy to defraud Federal and State health care benefit programs by billing for services for which payment was not authorized because the services rendered to the patient were not medically necessary or the patients to whom the services were provided were referred to the treating provider and returned for the payment of an unlawful kickback.

36.    That the Defendant, SACRED HEART HOSPITAL by its agents EDWARD NOVAK and ROY PAYAWAL, along with Defendant DOCTORS, engaged in a scheme to defraud Medicare and Medicaid by submitting and causing the submission of claims and the presentment of hospital cost reimbursement reports seeking payment for the sedation, intubation and subsequent performance of

9

tracheotomy procedures on patients absent the medical necessity to perform these procedures.

37.    That Defendants EDWARD NOVAK and ROY PAYAWAL, in concurrence with Defendant DOCTORS, engaged in a scheme, device, and conspiracy to defraud Federal and State health care benefit programs by submitting and causing the submission of claims and the presentment of hospital cost reimbursement reports seeking payment for the sedation, intubation, and subsequent performance of unnecessary medical procedures, including tracheotomies, on patients absent the medical necessity to perform these procedures.

38.    That in each of the above schemes to defraud Medicare and Medicaid, fraudulent documents, intended to further said scheme, were sent by mail carrier by Defendants or on their behalf and at their instruction.

**Kickback Scheme**

39.    That Defendants openly discussed the solicitation of physician and patient referrals with physicians and other executives. This included discussion during weekly meetings and the offering and awarding of incentives for prospective referrers.

40.    The EXECUTIVES retained responsibility for generating kickback checks, maintaining hospital accounting records that were designed to cover-up the racketeering activity, and creating paperwork to justify the kickbacks. They also tasked their employees with recording, tracking, and incentivizing physician patient

referrals. This included having meetings with physicians to discuss referral production and expectations to maintain kickback payment.

41.     That this type of kickback scheme was unethical and illegal pursuant to Federal Anti-Kickback statutes and the Stark Law.

42.     That Defendant DOCTORS regularly partook in the kickback scheme, accepting kickbacks and engaging in conduct intended to further the overall scheme, including:

a.      Defendant PERCY CONRAD MAY JR who accepted kickbacks from Sacred Heart of $2,000 monthly disguised as a rental agreement for patient referrals, and had previously been receiving up to $5,000 monthly based on the volume of referrals.

b.      Defendant DR. SHANIN MOSHIRI who accepted kickbacks from Sacred Heart of $2,000 monthly disguised as a contract to teach podiatry to students and included defendant NOVAK monitoring the amount of surgeries conducted by MOSHIRI.

c.      Defendant DR. SUBIR MAITRA accepted kickbacks from Sacred Heart of $2,000 monthly disguised as a contract to teach students at the hospital. MAITRA's conduct included creating transportation schemes to rapidly get patients to Sacred Heart and get patients sent to him through other patient referral sources that he would then funnel to Sacred Heart, resulting in

11

an alleged ten surgeries/patients per week.

d.      Defendant VENKATESWARA KUCHIPUDI, a/k/a V.R. KUCHIPUDI, otherwise known as the "king of nursing homes," had Sacred Heart pay the salary of his registered nurse, a physician to treat his patients, and a physician's assistant as kickback in exchange for patient referrals. As one of the more heinous offenders, KUCHIPUDI regularly admitted and instructed Sacred Heart staff to admit "patients" when they were referred to the hospital regardless of apparent need for admission. His admissions included instructing staff at a nursing home to admit exclusively to Sacred Heart unless "it's a 911." KUCHIPUDI also submitted numerous claims for treatment of patients on the weekends when it was generally not his practice to see any patients at that time.

43.     That Defendants solicited and accepted kickbacks for the referral of durable medical equipment and pharmaceutical prescriptions ordered for patients insured by Federal and State health care benefit programs.

44.     That kickbacks were deliberately sent by Defendant EXECUTIVES on behalf of Sacred Heart Hospital to Defendant DOCTORS, through the mail carrier system, as part of payment for participating in the overall scheme to defraud Medicare and Medicaid

**Unnecessary Treatment Scheme**

45.    That Defendants engaged in a scheme to defraud Medicare and Medicaid by submitting and/or causing the submission of claims and/or the presentment of hospital cost reimbursement reports seeking payment for emergency care evaluation, testing, and observation services that were not medically necessary, especially given that many times the patients receiving the unnecessary services were not suffering from any symptoms or indications that justify the treatment.

46.    That Defendants collectively and deliberately submitted claims and participated in conversations about those claims through the mail carrier as part of, and in furtherance of, the scheme to defraud Medicare and Medicaid.

47.    That Defendant DOCTORS engaged in conduct that caused patients to be admitted to the hospital regardless of their apparent need for admission, care, and treatment.

48.    That because Defendant EXECUTIVES and DOCTORS embarked on a scheme to increase hospital admission regardless of need, quality of care and medical analysis of patients suffered resulting in injury.

49.    That this defrauding of Medicare and Medicaid through unnecessary treatment was against Federal Statute 18 U.S.C. §1347.

50.    That fraudulently billing Medicare and Medicaid for unnecessary services through the mail carrier system was against Federal Statute 18 U.S.C. §1341.

51. That Defendants regularly ignored reports from hospital staff that physicians were subjecting their patients to unnecessary testing, treatment, and procedures in an effort to defraud Medicare and Medicaid and increase billing and hospital revenue.

52. That Defendants conduct also resulted in the regular admission of nursing home patients regardless of medical necessity. Ambulance services that Sacred Heart had a "relationship with" helped facilitate these admissions. Physicians instructed ambulance services to admit patients as "direct admissions." This direction meant ambulance drivers were not allowed to exercise their judgment for admission and were required to bypass all other hospitals en route to Sacred Heart, irrespective of necessity or distance.

53. That Sacred Heart physicians handpicked nursing home patients as they had a tendency to have been previously admitted for emergency room observation and evaluation, prior to being labeled a "direct admission."

54. That one of the ways these patients were identified as being part of the unnecessary treatment scheme when they were directed to be admitted to Room "200A" on accompanying paperwork, which is in fact not a room for treatment but used for overflow.

55. That patients would present with little medical history, evaluations, or guidance for treatment. In response, hospital staff were instructed to "thoroughly evaluate" with a battery of tests that included urine cultures, blood cultures,

14

electrocardiograms, chest x-rays, central venus lines and comprehensive metabolic panel blood tests.

56.   That patients who were "direct admissions" transported by ambulance, bypassing all other hospitals, directly to room "200A," were then admitted to the emergency room regardless of necessity. This scheme allowed Defendants to bill Medicare and Medicaid for a higher rate emergency care.

57.   That this scheme was continually engaged in by Defendant DOCTORS and personally approved by Defendant EXECUTIVES in an effort to increase hospital admission, defraud Medicare and Medicaid, and increase billing and revenue.

58.   That Defendant EXECUTIVES instigated and supported an environment that fostered and encouraged physician to focus their plan of care on unnecessary Medicare and Medicaid billing over patient care.

59.   That one such result of that environment allowed pulmonologists, including Defendant VENKATA BUDDHARAJU, and Defendants who acted in the same capacity as pulmonologists, to perform unnecessary intubations on patients.

60.   That pulmonologists employed by the hospital, including Defendant pulmonologist VENKATA BUDDHARAJU, under watch of Defendant EXECUTIVES, performed an unnecessarily high amount of intubations, resulting in patients with prolonged intubations and complications.

61.   That Defendant EXECUTIVES provoked and fostered this behavior because intubations, and the follow-up procedures including tracheostomies, were

15

considered Sacred Hearts "biggest money maker," and as such, patients who were intubated saw their treatment extended to capitalize on billing opportunities.

62.     That Defendant DOCTORS, under the supervision and support of Defendant EXECUTIVES, would over-sedate patients in order to depress the patient's breathing. Thus, the patients would artificially present as requiring intubation when it was otherwise unnecessary.

63.     That Defendant EXECUTIVES and DOCTORS would seek to have patients unnecessarily intubated for a longer time than required, which would result in further damage to their tracheas after 7-10 days.

64.     That the unnecessary treatment scheme employed by Defendants when intubating patients, causing damage to their tracheas, would then be further escalated when the pulmonologist would routinely suggest the patient receive a tracheostomy.

65.     That Sacred Heart Hospital employed surgeons, including Defendants VITTORIO GUERRIERO and MERLINE KELSICK, to perform, and who actually did perform those tracheostomies on patients who were unnecessarily intubated.

66.     That because the intubation was medically unnecessary, the patient's trachea damage caused by the intubation was also unnecessary. Therefore, the need to perform a tracheostomy was avoidable as it was only the result of an unwarranted procedure causing excessive damage.

16

67. That patients who went through the entire process of unnecessary intubation and tracheostomy achieved a maximum billing benefit after 27 days, and were then transferred out of the hospital to a long-term intensive care facility where they were further billed for physician visits.

68. That Defendant EXECUTIVES kept watch over this process in order to calculate the number of tracheostomy eligible patients there were in the hospital, and encouraged this unethical, harmful, and dangerous behavior even in the face of reports, concerns, and complaints raised about the activities and its risks.

69. That as a result of the unnecessary procedures performed by physicians including defendant DOCTORS, and encouraged and instigated by Defendant EXECUTIVES, just one of Sacred Heart's physicians had a mortality rate of 17.85% in the fourteen days following tracheotomy surgery. This percentage is nearly triple the average mortality rate of 5.64% by other physicians treating Medicare and Medicaid patients in Illinois.

70. That both Plaintiffs' decedents received intubation and tracheostomies at Sacred Heart hospital that were unnecessary and only performed as a result of the unnecessary treatment scheme and environment fostered at Sacred Heart as a result of the Defendants' actions.

71. That as a result of the tracheostomies, both Plaintiffs' decedents suffered complications and subsequently died.

17

*Pattern Element*

72.    That Defendant EXECUTIVES regularly instituted kickback schemes in order to generate referrals for the hospital.

73.    That Defendant DOCTORS regularly accepted kickbacks from the EXECUTIVES for participating in the patient referral scheme.

74.    That Defendants collectively used the mail carrier system in furtherance of their scheme to defraud Medicare and Medicaid through kickbacks and billing of unnecessary procedures, and the mail carrier system was used regularly to achieve this purpose.

75.    That while at this time it is unknown the exact number of times DEFENDANTS collectively engaged in the scheme to violate federal and state statutes, it is known that this conduct was engaged in for no less than one year resulting in numerous payments and referrals, voluminous enough that EXECUTIVES would track the frequency on spreadsheets.

76.    That while no exact number is available, it is alleged that Defendant CONRAD received at least 37 checks related to his kickback contract, MOSHIRI received 38 checks, MAITRA received 34, copious payments were made on behalf of KUCHIPUDI to his support staff, and an untold number of payments were made to Defendants VENKATA BUDDHARAJU, MERLIN KELSICK, and VITTORIO GUERRIERO for their participation in the Sacred Heart schemes.

18

77.     That Sacred Heart in recent years has billed Medicare and Medicaid for approximately $18,503,578.00 in reimbursements related to Part A claims, of which patients treated by Defendant KUCHIPUDI comprises roughly 19% of the claim submissions.

78.     That Sacred Heart continued to operate and do business where the core of its patient referrals came from physicians who received kickbacks that were against Federal and State statutes in order to achieve increased billing and revenue.

79.     That Sacred Heart continued to operate and do business where part of its treatment scheme was designed to administer unnecessary tests and procedures irrespective of necessity in order to achieve increased billing and revenue.

**Sacred Heart as an Enterprise**

80.     That 18 U.S.C. §1961(4) describes an enterprise as including individuals, corporations, and legal entities, or any union of persons associated in fact.

81.     That the following "persons" as defined by the Civil RICO act constituted the "enterprise" within the meaning of the Civil RICO Act.

  a.     Sacred Heart Hospital, a corporation, was registered and operating its business within the state.

  b.     Defendant EDWARD NOVAK, CEO and owner of Sacred Heart;

  c.     Defendant ROY PAYAWAL, CFO and a Vice President of Sacred Heart;

19

d.    Defendant VENKATESWARA R. KUCHIPUDI, a physician who was given privileges and was under contract with the hospital;

e.    PERCY CONRAD MAY, JR., a physician who was given privileges and was under contract with the hospital;

f.    SUBIR MAITRA, a physician who was given privileges and was under contract with the hospital;

g.    SHANIN MOSHIRI, a physician who was given privileges and was under contract with the hospital;

h.    VENKATA BUDDHARAJU, a physician who was given privileges and was under contract with the hospital;

i.    VITTORIO GUERRIERO, a physician who was given privileges and was under contract with the hospital; and

j.    MERLIN KELSICK, a physician who was given privileges and was under contract with the hospital.

82.    That the Kickback Scheme and Unnecessary Medical Treatment Scheme unified all Defendants into an association-in-fact as described and defined by 18 U.S.C. § 1961(4). This association-in-fact was created because the Defendants associated themselves in an effort of employing, participating, in a common scheme, to defraud Medicare and Medicaid at the expense of patient health and safety. This included instituting a framework of referral sources and administration of unnecessary procedures to increase billing and revenue.

83.     The Sacred Heart Enterprise was run by a hierarchy of Defendants EDWARD NOVAK and ROY PAYAWAL, CEO and CFO of Sacred Heart respectively. Defendant EXECUTIVES would employ support staff and administrators to solicit and retain the services of physicians who would refer patients to the hospital. These support staff and administrators were charged with the detailed record keeping, contract creation, and payment of all physicians who were part of the Sacred Heart Enterprise.

84.     The Sacred Heart Enterprise was engaged in by physicians, including Defendant DOCTORS, who were contracted and paid by Sacred Heart Hospital as part of a scheme to defraud Medicare and Medicaid through patient referrals and unnecessary medical procedures.

85.     This enterprise was funded through the giving of incentive checks by Defendant EXECUTIVES to Defendant DOCTORS with the primary purpose of increasing referrals, which resulted in the submission of said referrals by Defendant DOCTORS to Sacred Heart Hospital in order to continue as part of the enterprise.

86.     That patients who were unnecessarily referred to the hospital would then, at the behest of Defendant DOCTORS, be subjected to excessive and needless tests and procedures including intubation and tracheostomies.

87.     This unnecessary referral and treatments resulted in the unwarranted payment of patient benefit funds by Medicare and Medicaid to Sacred Heart Hospital.

88.    That an unknown amount, but at least part of these payments, were then reused and reinvested in kickback payments to Defendant DOCTORS as a means of perpetuating the cycle of referral and unnecessary treatment.

**Defendants Racketeering Activity**

89.    That Defendants EDWARD NOVAK AND ROY PAYAWAL and Defendant DOCTORS engaged in a scheme, device, and conspiracy to recruit physicians that would refer Federal and State heath care insured patients to Sacred Heart Hospital for kickbacks, and then accept said kickbacks through check administration facilitated through hospital employees.

90.    That Defendants EDWARD NOVAK, ROY PAYAWAL, and DOCTORS individually and collectively knew the following

      a.    That Medicare is a federally funded health care benefit program that provides care to eligible individuals, primarily the elderly, blind, and disabled. These persons are known as Medicare beneficiaries.

      b.    That Medicaid is a federally assisted grant program that enables states to provide medical assistance and related good and services to needy individual. These personas are known as Medicaid beneficiaries.

      c.    That Medicare Part A pays for inpatient care services for the beneficiary, while Part B pays for physician and outpatient

services.

d.    That in order to receive payment from Medicare and Medicaid, hospitals and physicians including all Defendants, had to sign an agreement that required them "[t]o abide by Medicare laws, regulations, and program instructions that apply to [it]."

e.    That part of the regulatory requirements all hospitals and doctors, including all Defendants, needed to abide by include Federal anti-kickback statutes and the Stark law further regulating physician referrals.

f.    That all hospitals and physicians, including Defendants, agreed "[they would] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard for their truth or falsity."

91.    That Defendants at the direction and with the approval of EDWARD NOVAK, and assistance of ROY PAYAWAL, implemented a scheme, device, and conspiracy to offer and pay physicians, who would accept those funds, for referring patients to Sacred Heart Hospital.

92.    The Defendants EDWARD NOVAK, ROY PAYAWAL, and DOCTORS sought to conceal Sacred Hearts' patient referral methods by creating and entering into agreements that masked the payments as fictitious rental payments,

paying the salaries of physicians' employees, providing physicians with ghost contracts, creating alternative insurance billing arrangements, and arranging for physicians to participate in paid medical training programs.

93.     That Defendants collectively conspired and administered unnecessary medical treatment in order to increase hospital revenue and billing.

94.     That Defendants collectively and individually violated Federal statutes through their conduct, including 18 U.S.C §1962(c), 18 U.S.C. §1347, Federal Anti-Kickback statutes, and the Stark Law.

95.     That Defendants also violated 18 U.S.C §1341, known as part of the Mail Fraud statutes, which provides punishment for those persons who devise a scheme to defraud that includes the placing of mail, either through they own hand or by direction, in a mail carrier or commercial carrier to have delivered some article used in furtherance of that fraud.

96.     That Defendants regularly sent kickback checks by mail to physicians that were intended to be used in furtherance of the scheme whose ultimate goal was to defraud Medicare and Medicaid.

97.     That Defendants regularly submitted claims and corresponded with Medicare and Medicaid through mail carriers that were the result of the scheme to defraud Medicare and Medicaid at Sacred Heart Hospital.

98.     That the mail fraud in addition to the other federal statute violations accumulates to a substantial amount of racketeering activity on the part of the

Defendants that was a scheme intended to defraud Medicare and Medicaid.

Wherefore, Plaintiffs, Estate of KATHERYN ROBINSON, deceased, by her Special Administrator REGINALD ROBINSON, and Estate of WALTER BRUCE, deceased, by his Special Administrator LEE A. HEDRICKS, prays this Honorable Court for judgment in their favor against the Defendants, individually and collectively for treble damages in excess of $50,000, attorney's fees, and all reasonable associated costs and fees.

## COUNT II – STATE RICO

99.    Plaintiffs hereby incorporate their allegations in paragraphs 1 through 98 of this Complaint at Law to Count II as though fully set forth herein and allege as follows.

100.    Count II asserts a claim against Defendants collectively based on 720 ILCS 5/33G-4 (West 2012), known as Illinois Civil RICO for engaging in a concerted action for the purpose of illegally obtaining kickbacks and benefit payment through racketeering activity.

101.    In Illinois, civil conspiracy may be established when there is "a combination of two or more persons for the purpose of accomplishing, through concerted action, either an illegal object or a legal object by an illegal means." *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 350 (200).

102.    That in Illinois, civil RICO actions are codified in the Illinois Street Gang and Racketeer Influenced and Corrupt Organizations Law.

25

103.    That, as asserted in paragraphs 1 through 98, Defendants were a part of a legal enterprise comprised of significantly more than two people, and joined themselves together as an association-in-fact through a common purpose of defrauding Medicare and Medicaid through kickbacks and billing of unnecessary medical care and procedures.

104.    That Defendants joined in concerted action through both the Kickback Scheme and the Unnecessary Medical Procedure Scheme when they planned, arranged, and agreed to organize, fund, and participate in both schemes as outlined in paragraphs 1 through 98.

105.    That Defendants joined in the concerted action to engage and participate in the schemes for the purpose of defrauding Medicare and Medicaid to directly acquire benefit money paid through a legal program by illegal means.

106.    That Defendants' actions were illegal pursuant to 305 ILCS 5/8A-2 (West 2012), which establishes as illegal for any person or corporation to falsely represent facts and information through a scheme with the intention of obtaining benefits paid through Medicare for the benefit of the person or the corporation.

107.    That Defendants, as outlined in paragraph 1 through 98, falsely represented unnecessary medical procedures as necessary to both the patients and to Medicare and Medicaid with the intention of obtaining benefit payments for economic benefit.

108.    That Defendants' actions were also illegal pursuant to 305 ILCS 5/8A-16

(West 2012) which makes it illegal to knowingly engage in "deceptive marketing practice in connection with proposing, offering, selling soliciting, or providing any health care service or any health plan." This includes offering kickbacks to encourage the selection of a health care provider.

109. That Defendants, as outlined in paragraphs 1 through 98, engaged in a scheme in which they solicited, offered, and received kickbacks in order to encourage solicitation and referral of patients to Sacred Heart Hospital so that the hospital could provide health care services in lieu of any other providers.

110. That the illegal means by which Defendants combined in concerted action to refer, solicit referrals, provide unnecessary medical, and bill Medicare and Medicaid for unwarranted benefit payments was a violation of the Illinois civil RICO statute.

Wherefore, Plaintiffs, Estate of KATHERYN ROBINSON, deceased, by her Special Administrator REGINALD ROBINSON, and Estate of WALTER BRUCE, deceased, by his Special Administrator LEE A. HEDRICKS, prays this Honorable Court for judgment in their favor against the Defendants, individually and collectively for treble damages in excess of $50,000, attorney's fees, and all reasonable associated costs and fees.

27

Plaintiff Demands Trial by Jury.

CURCIO LAW OFFICES
Attorneys for Plaintiff

By:     /s/Joseph R. Curcio

161 N. Clark St., Suite 2240
Chicago, Illinois 60601
312.321.1111
Attorney No: 02485

28